IN THE COURT OF APPEALS 9/9/97

OF THE

STATE OF MISSISSIPPI

NO. 93-CA-00941 COA

WILSON L. TURNER

APPELLANT

v.

**A. L. TURNER, CARL W. TURNER, THOMAS R. TURNER, JAMES T. TURNER,
DOROTHY TURNER SMITH, CELESTE TURNER SHOEMAKE, VERNICE T. CRAFT,
VASTIE TURNER ROBERTSON, RANDALL B. TURNER, WILLIAM A. TURNER,
WANDA L. JEFFCOAT, AND JOHN W. TURNER**

APPELLEES

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. J. SHANNON CLARK

COURT FROM WHICH APPEALED: JONES COUNTY CHANCERY COURT

ATTORNEY FOR APPELLANT:

WILLIAM N. GRAHAM

ATTORNEY FOR APPELLEES:

ROBERT B. CHILDERS

NATURE OF THE CASE: REFORMATION OF DEED TO CORRECT GRANTOR'S
RESERVATION OF MINERAL INTEREST

TRIAL COURT DISPOSITION: DEED REFORMED TO RESERVE 12/22 INTEREST RATHER
THAN 1/11 INTEREST IN MINERALS AS WRITTEN IN DEED

MOTION FOR REHEARING FILED: 9/22/97

CERTIORARI FILED: 12/8/97

MANDATE ISSUED: 4/1/98

EN BANC

SOUTHWICK, J., for the court

The parties are the heirs of Alvin H. Turner, whose death in 1966 left a legacy of property and problems for his kin. Beginning in 1967 these heirs have executed deeds among themselves regarding various parcels and mineral interests that were inherited. The chancellor reformed a 1970 deed, finding that none of the parties to that deed had intended that the widow of Alvin H. Turner part with any of her minerals in that deed. The successor to the grantee appeals, arguing statutes of limitation, laches, and substantiality of the evidence. We find that the chancellor correctly applied the law to factual findings that were supported by substantial evidence, and therefore affirm.

FACTS

When Alvin H. Turner died intestate in 1966, his heirs were his widow, eight children, and the descendants of two additional, deceased children. Thus his widow, his surviving children, and the group of heirs for a deceased child, each received 1/11 of his estate.

This litigation is centered on two deeds executed by his heirs, one in 1967 and the other in 1970. The 1967 instrument was a conveyance of two tracts of land. Alvin Turner and his wife Callie had owned these two tracts as tenants in common. When Mr. Turner died, his half interest in this property was inherited 1/11 each as described above. Only one grantor in the 1967 deed -- Alvin Turner's widow Mrs. Callie Turner -- reserved oil and gas, and she reserved all that she owned. The effect of the deed was to reserve to Callie Turner a 12/22 mineral interest, being the ½ interest in the property that she owned prior to her husband's death, and a 1/11 of ½ that she inherited as one of her husband's heirs.

Three years later, when the then-owner of the two tracts wished to get a loan secured by a deed of

trust, it was discovered that the deed description of one of the tracts was erroneous. The deed had placed the property in the northeast quarter of northwest quarter of a governmental section, when the property was actually in the southeast quarter of northwest quarter. A correction deed was therefore prepared in 1970 that recited that it had the "purpose of correcting an error contained in the description of the land in the former deed. . . ." This case revolves around whether the language selected to express the grant of property and reservation of minerals, which went beyond the stated purpose, should be reformed. After correcting the description, the deed stated that Callie Turner "reserves unto herself all of her undivided 1/11 interest" in the minerals. A reasonable explanation for that fraction is obvious. Callie Turner would have had a 1/11 interest if her husband had owned all the minerals when he died. Since Callie Turner and her husband owned the property as tenants in common, she had a ½ interest before he died, and an additional ½ x 1/11 interest as an heir.

The legal effect of the language chosen is not in dispute. Reserving all of a grantor's 1/11 minerals, regardless of whether that grantor owns all or half or some other portion, reserves at most a 1/11 mineral interest. *Thornhill v. System Fuels, Inc.*, 523 So. 2d 983, 991 (Miss. 1988)(grant of an interest in minerals conveys all not specifically reserved). The factual question is whether the parties intended that any of Callie Turner's 12/22 mineral interest be conveyed. If the facts support that the fraction stated was a mutual mistake and none of her minerals were to be conveyed, the legal question is whether a suit to reform that deed is barred either by a statute of limitation or laches.

In the years that intervened between 1970 deed and 1992 suit, little relevant occurred with the property until 1989, when an oil and gas well began producing. The defendant in the reformation suit is Wilson L. Turner. Wilson Turner by subsequent deed became the owner of whatever was conveyed in the 1970 correction deed. The grantee in the 1967 deed was Celeste Thomas. Five weeks after she was deeded the property in 1967, Mrs. Thomas deeded it to her brother Wilson, "subject to the prior reservation of all oil, gas, and minerals. . . ." By that deed, Wilson Turner received no mineral interest. *Pfisterer v. Noble,* 320 So. 2d 381 (Miss. 1975). The grantee in the 1970 correction deed also was Celeste Thomas. The day after the deed, she again conveyed the property to Wilson Turner. The conveyance was made "subject to any prior reservation" of minerals. Since that language specifically reserved nothing, all minerals that Celeste Thomas owned were conveyed. *Thornhill,* 523 So. 2d at 991. The result of these transactions is that whatever mineral interest Callie Turner conveyed was owned at the time of this litigation by Wilson Turner.

Wilson Turner's arguments would leave him with the 12/22 mineral interest owned by Callie Turner in 1970, less the 1/11 that the deed referenced. The plaintiffs seeking reform are most of the remainder of the present heirs of Alvin H. Turner. Mrs. Callie Turner is deceased as are others of the original 1966 heirs. The plaintiffs wish to have Wilson Turner receive what the chancellor said was the intent of the 1970 deed, i.e., none of Callie Turner's minerals.

Among the initial parties to this reformation suit were various mineral lessees. Those companies were severed from this part of the litigation and are therefore not parties to this appeal.

## DISCUSSION

### 1. Statute of limitations

Wilson Turner argues that two Mississippi statutes bar this suit because it was brought more than ten years after the relevant deeds were recorded. These are the statutes:

Section 15-1-7. Limitations applicable to actions to recover land.

A person may not make an entry or commence an action to recover land except within ten years next after the time at which the right to make the entry or to bring the action shall have first accrued to some person through whom he claims, or, if the right shall not have accrued to any person through whom he claims, then except within ten years next after the time at which the right to make the entry or bring the action shall have first accrued to the person making or bringing the same. . . .

Miss. Code Ann. § 15-1-7 (1995).

Section 15-1-9. Limitations applicable to suits in equity to recover land.

A person claiming land in equity may not bring suit to recover the same except within the period during which, by virtue of section 15-1-7, he might have made an entry or brought an action to recover the same, if he had been entitled at law to such an estate, interest, or right in or to the same as he shall claim therein in equity. . . .

Miss. Code Ann. § 15-1-9 (1995).

These are hardly new statutes. The case law that has developed on reformation of deeds has acknowledged the terms of these limitation statutes. Despite the passage of more than ten years, a deed is subject to reformation to reflect the actual intent of the parties that due to a mutual mistake was not properly expressed in the language of the instrument. *Sunnybrook Children's Homes, Inc. v. Dahlem*, 265 So. 2d 921, 925 (Miss. 1972). In that case, suit was brought in the late 1960's (the precise date is not given) to reform a 1938 deed; the deed was reformed without any concern with the statutes of limitation. *Sunnybrook,* 265 So. 2d at 925.

An even more germane precedent is *Searcy v. Tomlinson,* 358 So. 2d 373 (Miss. 1978). The interpretation of the limitation statutes that is urged by Wilson Turner here was rejected in that case:

The principal question on this appeal is whether the ten year statute now bars a reformation. Sections 15-1-7 and 15-1-9, applicable here [the same two sections cited by W. L. Turner], speak in terms of "make an entry" and "commence an action to recover land." In *Newman v. J.J. White Lbr. Co.,* 162 Miss. 581, 139 So. 838 (1932), this court that these statutes do not begin to run against one in the actual or constructive possession of land, and who has the right to such possession.

*Searcy,* 358 So. 2d at 374. The court went on to say that if the grantee in a deed receives more property than either party to the transaction intended, then he does not have the "intent to possess [that] is an integral part of the concept of constructive possession." *Id.* at 375. Thus, citing the statutes of limitations does not end the analysis. Those statutes form the context for answering the question with which we must grapple, namely, whether intent to possess exists. If it does, then the statutes are running and ultimately will bar a claim. Without such an intent, there is no bar to the action.

The reason for this rule can perhaps better be seen not only by viewing the intent of the grantee to possess, but also by considering the perspective of the grantor to retain possession. With a surface estate, if a grantor remains in possession of the part of the surface that was included in a deed only because of the mutual mistake of the parties, then the statute of limitation is not running against him. Minerals are a little more elusive to possess. Until minerals are produced, there is nothing akin to physical possession for grantor or grantee. It is true that a surface owner constructively possesses unsevered minerals, but here the factual question is whether the grantor to an instrument intended that her 12/22 be severed from the surface. Unless intent to possess is made a factor for nonproducing minerals -- intent both of a grantor to relinquish and of a grantee to commence -- then most reformation of errors in conveyance of minerals would be barred after ten years, but depending on possession, errors in deed descriptions of a surface estate likely would not. Legal doctrine should not treat ownership of different components of real property in such divergent ways. *Searcy* makes it evident that Mississippi legal doctrine does not.

We examine in the final section of this opinion the evidence on intent to possess. That evidence determines whether the statutes of limitations now bar this claim.

## 2. Laches

The chancellor did not address laches. Instead, he only discussed the reasons for finding the limitation statutes to be inapplicable. Wilson Turner properly describes the relevant law. Laches may bar a suit when there is delay in asserting a claim, if the delay was inexcusable, and if undue prejudice resulted. *Allen v. Mayer*, 587 So. 2d 255, 260 (Miss. 1991). Laches will not bar a suit in less time than the ten years of the statute of limitations. *Hans v. Hans*, 482 So. 2d 1117, 1120-21 (Miss. 1986). The question for us is whether laches will bar the claim when more than ten years has passed since the potentially erroneous deed was executed.

Whatever other contexts arise for laches, the present one is the kind of fact situation in which the issue exists and is not just an added, boilerplate defense. The statute of limitations might not have commenced even though more than ten years have passed since the erroneous deed was executed, but the right to sue surely does not remain alive indefinitely. It does remain alive until the *Mayer* analysis requires otherwise. There definitely was delay by the various heirs in asserting the claim against Wilson Turner, in that the "claim" has existed since 1970 when the correction deed was executed. Yet the delay is not unreasonable. The family got together in 1970 to correct an instrument that had a bad description. If in fact that was the only purpose for the deed and there was no reason for these lay people to understand that the deed did anything to the mineral interest, then it is reasonable that no one would act until the problem was noticed either at the time of oil and gas leasing or at production. Since production did not occur until 1989, it is not unreasonable that no one was aware of this dormant problem until that time.

The final factor for laches as discussed in *Mayer* is whether undue prejudice resulted. Wilson Turner argues that the prejudice was that Callie Turner died in 1990, while suit was not brought until 1992. Callie Turner arguably could have stated whether her intent was to convey her 12/22 mineral interest less the 1/11 specifically referenced in the deed. It is true that if Callie Turner were alive to testify, and if her memory and mind were clear, and if her own possible self-interest in maintaining over five times more producing mineral interest were totally out of the equation, then more direct evidence of

what happened in 1970 would have been provided. Whether the absence of that view prejudiced or benefitted Wilson Turner cannot be stated, since we do not know what Callie Turner would have said.

We find the alleged prejudice caused by Callie Turner's unavailability to be equally a burden of each side to this dispute, and consequently not a reason to rule in favor of one party by invoking the doctrine of laches. There was delay, but it was neither unreasonable nor prejudicial to the person raising laches as a defense.

*3. Proof to support Reformation*

A chancellor's findings of fact are entitled to the same deference as a jury verdict, and we accept those findings absent manifest error. *Voss v. Stewart,* 420 So. 2d 761, 765 (Miss. 1982). Of course, conclusions regarding the law are always determined de novo by an appellate court.

In our case, one reformation voluntarily occurred in 1970 after the parties realized that there was a property description error. Had any party objected to reformation, the others would have been entitled to bring suit for reformation. Instead, in 1970 there was no objection and of course no statute of limitations problem. This suit arose twenty years later. By then there was production of oil and gas on the property, and the alleged error in the deed concerned the size of the mineral interest that various individuals owned. The issue is the same, however. Was there a mutual mistake that arose in the 1970 instrument, and if so, does some other rule of law now bar the reformation?

The chancellor, listening to the witnesses and making judgments on credibility, had to apply the evidence before him to the case law on reformation. The Mississippi Supreme Court has dealt with precisely these kinds of intent issues in two companion cases, one of which we have already discussed. *Florida Gas v. Searcy,* 385 So. 2d 1293 (Miss. 1980); *Searcy v. Tomlinson,* 358 So. 2d 373 (Miss. 1978). These two opinions were rendered in separate appeals from the same lawsuit. Each focuses on the elements of adverse possession, which include "hostile, actual, open, notorious, exclusive and continuous occupancy" for ten years. *Tomlinson*, 385 So. 2d at 1297. Non-producing minerals can be constructively possessed, but adverse possession is not occurring if the would-be owner "does not understand that he owns it, does not claim it, and does not intend to possess it." *Florida Gas*, 358 So. 2d at 375. There must be an intent to claim dominion before there an adequate claim of right for this statute of limitation. *Id.* In those two opinions, the court concluded that the grantor and the grantee both understood that the effect of the deeds was to split the grantor's ½ mineral interest evenly, i.e., 1/4 to each. The legal effect of the deed, however, was to give all the mineral interest to the grantee. Adverse possession had not been occurring because the grantee never intended to possess more than a 1/4 interest. Consequently the court allowed the deed to be reformed. *Id.* at 1297-98.

Thus, our case comes down to whether there was evidence in the record as to the original intent, and whether despite the intent, Wilson Turner had adversely possessed the minerals. On the first point, there was substantial evidence that no one anticipated that the correction deed was divesting the mother Callie Turner of 80% of her mineral interest. Such a change was never a consideration in a transaction that arose from the need in 1970 to place the property in the southeast instead of the northeast quarter of a quarter section of land. Mutual mistake is almost unavoidably the conclusion, as even to refer to Callie Turner's interest as 1/11 was quite literally an error.

The grantee, Wilson Turner, testified that all along he understood that he was getting more minerals as a result of the 1970 deed. He alone testified that he brought this up when the deed was signed in 1970. The self-interest of the witnesses on both sides of this transaction is significant. It would be difficult to credit either side with unimpeachable accuracy in their testimony. The chancellor had the initial role of listening to the testimony, examining the exhibits, and in other ways reaching his findings regarding the facts of this case. A correction deed whose reason for execution was that the grantee, Wilson Turner, could not get a loan on his house until a description error was changed, would not normally be expected also to make a significant change in the ownership of the minerals. The chancellor's view of the deed is consistent with the instrument's purpose and with the weight of the testimony. He was not manifestly mistaken in finding a mutual mistake.

Having upheld the finding of mutual mistake, we turn to whether Wilson Turner adversely possessed the minerals for more than ten years. That requires an intent on his part to possess more than what the chancellor just concluded was the intended size of the original grant. Adverse possession is an affirmative defense. Consequently, it was Wilson Turner's burden to prove his intent, not the other heirs' burden to disprove it. *Florida Gas,* 385 So. 2d at 1297-98. The only evidence of Wilson Turner's intent was his statement on the stand. The rules for adverse possession of minerals established in *Searcy* and *Florida Gas* were novel and even somewhat revolutionary when they were announced. J. Sheldon and J. Milam, "Recent Developments in Oil and Gas Law," *Mississippi Oil and Gas Law: Selected Papers and Bibliographies* (1988), at 151, 161-164. Still, these cases did not give the grantee of a deed total control from the witness stand over the disposition of a case. Other heirs stated that the first they knew that their brother was claiming all but 1/11 of the mineral interest was in 1987. Once the chancellor determined that the parties', including Wilson Turner's, 1970 intent was just to enter a correction of a property description, it was necessary for Wilson Turner to show by clear and convincing evidence that at some time between 1970 and ten years before suit was brought, he began adversely to possess all but 1/11 of the minerals. *Thornhill v. Caroline Hunt Trust Estate,* 594 So. 2d 1150, 1153 (Miss. 1992). Wilson Turner had no evidence except his testimony. He did not show that he had put any of his siblings or anyone else on notice of his claim, that he had leased to an oil company asserting a greater interest, or done anything else more than ten years prior to suit. The chancellor was entitled to determine that Wilson Turner had not carried his burden of proving that adverse possession barred this claim.

A significant difficulty with the case law is that it could make someone's unknown and unknowable intent controlling. Such a rule invites self-serving testimony when the issue arises. The trial court did not let one person's testimony control. What a trial court has to do is sort through the evidence within the framework of the burdens of proof, and make its findings. The chancellor did that. There was no error, much less manifest error.

**THE JUDGMENT OF THE CHANCERY COURT OF JONES COUNTY IS AFFIRMED. ALL COSTS ARE TAXED TO THE APPELLANT.**


**McMILLIN AND THOMAS, P.JJ., DIAZ, AND PAYNE, JJ., CONCUR.**


**COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY**

**BRIDGES, C.J., AND KING, J.**

**HERRING AND HINKEBEIN, JJ., NOT PARTICIPATING.**

**IN THE COURT OF APPEALS**
**9/9/97**

**OF THE**

**STATE OF MISSISSIPPI**

NO. 93-CA-00941 COA

WILSON L. TURNER APPELLANT

v.

A. L. TURNER, CARL W. TURNER, THOMAS R. TURNER,

JAMES T. TURNER, DOROTHY TURNER SMITH, CELESTE

TURNER SHOEMAKE, VERNICE T. CRAFT, VASTIE TURNER

ROBERTSON, RANDALL B. TURNER, WILLIAM A. TURNER,

WANDA L. JEFFCOAT AND JOHN W. TURNER APPELLEES

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

COLEMAN, J., DISSENTS:


I would reverse and render the judgment of the Jones County Chancery Court because I am persuaded that Sections 15-1-7 and 15-1-9 of the Mississippi Code of 1972 (Rev. 1995) bar the Appellees' claim to reform the two deeds. Had the chancellor addressed the issue, I would also find that the Appellees' claim, if not barred by these two statutes, is barred by the doctrine of laches. I am confident that my colleagues who join in the majority opinion understand that I dissent with utmost respect and regard for their analysis and resolution of the issues in this case. The original plaintiffs who sought to reform the two deeds are designated in this dissent as the "Shoemake Plaintiffs" because many of the plaintiffs' surname was Turner. The designation of "Shoemake" is borrowed from the surname of Celeste Turner Shoemake, sister of Wilson L. Turner, the Appellant. This dissent begins on a point of agreement with the majority, who state in the opening sentence of their opinion that Alvin H. Turner's "death in 1966 left a legacy of property and problems for his kin."


I. Statutes of Limitations

A. *Sunnybrook Children's Homes, Inc. v. Dahlem*, 265 So. 2d 921 (Miss. 1972).

The majority writes that "[d]espite the passage of more than ten years, a deed is subject to reformation to reflect the actual intent of the parties that due to a mutual mistake was not properly expressed in the language of the instrument," and they cite *Sunnybrook Children's Homes, Inc. v. Dahlem*, 265 So. 2d 921 (Miss. 1972), to support that assertion (Majority Opinion, p. 5). Were I persuaded that *Sunnybrook* supported that proposition, I would perforce join the majority opinion. It therefore becomes incumbent that I explain why I find *Sunnybrook* unpersuasive that "[d]espite the passage of more than ten years, a deed is subject to reformation to reflect the actual intent of the parties that due to a mutual mistake was not properly expressed in the language of the instrument,"

The essential facts in *Sunnybrook* were the following: On May 2, 1938, N. W. Dahlem executed and delivered to his wife, Mrs. Nettie Dahlem, a deed by which he conveyed one hundred seventy acres of land to her. *Sunnybrook*, 265 So. 2d at 922. Those one hundred seventy acres were described as "[a]lso 170 acres, off the N. side, of S 26, T15, R__E, Monroe County."*Id*. On March 25, 1971, Mrs. Nettie Dahlem conveyed to the Sunnybrook Children's Home, Inc., (Sunnybrook) "all minerals under the 170 acres." *Id*. Sunnybrook filed its original bill of complaint to reform the 1938 deed from N. W. Dahlem to his wife, in which it alleged that the omission of the correct range number, which was 7, was an error of the scrivener of that deed, and, thus, it was entitled "to have such omission supplied by reforming the deed by inserting in [it] the correct range number." *Id.*

The Appellees, Wendell Earl Dahlem and James Otto Dahlem, who were apparently the children of N. W. and Nettie Dahlem, "answered, denied [that Sunnybrook] was entitled to reformation, made their answer a cross-bill, and alleged that N. W. Dahlem had been the owner of the one hundred acres when he died. *Id*. They further alleged that N. W. Dahlem had devised this acreage to them subject to a life estate which he had also devised to his wife, Mrs. Nettie Dahlem. *Id.* Sunnybrook responded to the sons' cross-bill by filing an amended bill of complaint in which it alleged in the alternative that by virtue of the last will and testament of N. W. Needham, his widow was vested with a life estate in the one hundred seventy acres with the right to "sell mineral rights . . . ." Sunnybrook prayed that it "be

declared the owner in fee simple of the timber and mineral rights in said 170 acres of land." *Id.*

Mrs. Nettie Dahlem "answered the original and amended bill of complaint, admitted the allegations of the original and amended bill, and adopted as her own [Sunnybrook's] answer to the cross-bill filed by [Wendell Earl and James Otto Dahlem]." *Id.* at 922-23. The Dahlems' two sons answered Sunnybrook's amended bill of complaint to deny Sunnybrook's allegations and to pray that they be decreed the fee simple owners of the one hundred seventy acres, subject to their mother's life estate. *Id.* at 923.

The chancellor denied Sunnybrook's prayer that the 1938 deed to Mrs. Nettie Dahlem be reformed because it found that the omission of the range number was a "patent" ambiguity, the explanation of which could not be provided by parole evidence." *Id.* On appeal, the Mississippi Supreme Court opined that "[a]s between appellant and appellees, the only matter necessary for decision is whether or not appellant was entitled to have the deed in question reformed by insertion of the range number. *Id.* The supreme court then held that the chancellor erred when he sustained the Dahlems' sons' objections to Sunnybrook's offer of parole evidence to explain the omission of the range number from the 1938 deed and reversed and rendered the chancellor's refusal to reform the deed as Sunnybrook had prayed.

I have dealt in this detail with *Sunnybrook* to demonstrate that for whatever reason, the application of the statute of limitations to the reformation of a deed executed more than thirty years earlier was never raised as a defense by the defendants-appellees, Wendell Earl and James Otto Dahlem. I remain of the opinion that the Mississippi Supreme Court resolved Sunnybrook's appeal solely on the issue of whether the chancellor erred when he held that parole evidence could not be used to explain a "patent" ambiguity in the 1938 deed. I suggest that "the deed was reformed without any concern with the statutes of limitation" (Majority Opinion p. 5) because the issue of whether any statute of limitation barred the reformation of the 1938 deed was not raised -- and thus not adjudicated -- in *Sunnybrook*. Hence, I reject with deference the majority's conclusion, which it rests on *Sunnybrook,* that "[d]espite the passage of more than ten years, a deed is subject to reformation to reflect the actual intent of the parties that due to a mutual mistake was not properly expressed in the language of the instrument." *See Sears Roebuck & Co. v. Devers*, 405 So. 2d 898, 900 (Miss.1981) (holding that when defendant "failed to affirmatively plead the one year statute dealing with civil suits based upon an assault, of course it waived this defense").

There remains yet another reason to differ with the statement that "[d]espite the passage of more than ten years, a deed is subject to reformation . . . .," and that reason is stated in a quotation from *Searcy v. Tomlinson Interests, Inc.*, 358 So. 2d 373, 374 (Miss. 1978) on which the majority relies. (Majority Opinion, p. 5). The quotation is:

The principal question on this appeal is whether the ten year statute now bars a reformation. Sections 15-1-7 and 15-1-9, *applicable here* [the same two sections cited by W. L. Turner], speak in terms of "make an entry" and "commence an action to recover land."

*Searcy*, 358 So. 2d at 374 (emphasis added).. I interpret this sentence to mean that the Mississippi Supreme Court has held that Sections 15-1-7 and 15-1-9 of the Mississippi Code of 1972 (Rev. 1995) are the relevant statutes of limitations which may to bar claims to reform deeds as matters of

affirmative defense. I remain of the opinion that claims for the reformation of a deed are subject to the operation of the statutes of limitations, Sections 15-1-7 and 15-1-9.

## B. Standard of review

Issues of law presented to this Court are provided de novo review. *UHS - Qualicare v. Gulf Coast Community Hospital*, 525 So.2d 746, 754 (Miss.1987). In *Gillis v. Case*, 574 So. 2d 692, 693 (Miss. 1990), the Mississippi Supreme Court, in an opinion written to review a petition for rehearing, considered whether an instrument executed by a debtor was an equitable mortgage which was barred by the statute of limitations. The supreme court explained:

Today we are called upon to assess, under our limited standard of review, the correctness of the Chancellor's determination *on a question of law*, that an instrument executed by a debtor was an equitable mortgage which was barred by the statute of limitations. We hold that the Chancellor's finding was incorrect, and accordingly, reverse.

*Id.* (emphasis added). The foregoing quotation establishes that whether to apply a statute of limitation to bar a claim is a question of law, and therefore this Court can review *de novo* as a question of law the issue of whether the Shoemake Plaintiffs' claim to reform the deeds in question is barred by Sections 15-1-7 and 15-1-9.

## C. Law applicable to the intent of the parties, including Wilson L. Turner and his mother, Mrs. Callie D. Turner

In my view, the following two sentences in the majority opinion are the keystone on which the jurisprudential arch of the majority opinion depends for its ultimate support: "Those statutes [Sections 15-1-7 and 15-1-9] form the context for answering the question with which we must grapple, namely, whether intent to possess exists. If it does, then the statutes are running and ultimately will bar a claim." (Majority Opinion, p. 5). I opine that the intent of all the parties to both correction deeds, *i. e.*, Mrs. Callie D. Turner, Wilson Turner, and the Shoemake Plaintiffs, can only be ascertained by relevant Mississippi statutes and the Mississippi Supreme Court's interpretation and application of those statutes to deeds like the two correction deeds which are the subject of this litigation.

I will endeavor to explain that the application of those statutes and judicial interpretations and applications of those statutes to cases similar to this one control and determine the intent of the parties to these correction deeds when they executed, delivered, and accepted them. These statutes can only establish that after February , 1971 Wilson L. Turner owned an undivided ten-elevenths (10/11) interest in the minerals which were conveyed to him by the second correction deed from his sister, Celeste T. Thomas, and that it was no more necessary for him to demonstrate his intent to own an undivided ten-elevenths (10/11) interest in the minerals than it was for him to demonstrate that he intended to own the surface of the land. Then I propose to persuade that Sections 15-1-7 and 15-1-9 began to run against Mrs. Callie D. Turner from and after February 9, 1971, the date the first correction deed with her properly executed acknowledgment attached to it was recorded.

The following paragraph from 23 American Jurisprudence 2d *Deeds* § 224 (1983) explains:

Unlike a rule of construction, a settled rule of law or rule of property is one which fastens a specific import and meaning upon particular language employed in a deed and states arbitrarily the legal effect which such language will have, attaching thereto a specific and unimpeachable intention, even though the parties employing the language may have had and may have evinced quite a different intention. Such rules therefore ingraft certain meaning upon language employed in a deed and determine what effect is given to such language in law. In other words, a rule of property is to be applied automatically as a resultant of the language used, and the court will not refuse to apply such rule merely on the surmise that the grantor did not intend that his phraseology operate in the way which the rule makes it operate.

23 Am. Jur. 2d *Deeds* § 225 (1983).

The correction deed dated September 9, 1970, which Callie D. Turner, her eight children, and the guardian of her four grandchildren executed and delivered to Celeste T. Thomas, who was Wilson L. Turner's immediate predecessor in title, contained the granting clause that the grantors "do hereby, subject to the reservation and condition hereinafter stated, sell, transfer and quitclaim unto Celeste T. Thomas. . . ." Section 89-1-37 of the Mississippi Code of 1972 provides:

A conveyance without any warranty shall operate to transfer the title and possession of the grantor as a quitclaim and release.

Miss. Code Ann. Sec.89-1-37 (1972). Thus the correction deed to Celeste T. Turner dated September 9, 1970, was a quitclaim deed because it conveyed the subject parcels of land "without any warranty."

Section 89-1-39 of the Mississippi Code of 1972 provides:

A conveyance of quitclaim and release shall be sufficient to pass all the estate or interest the grantor has in the land conveyed, and shall estop the grantor and his heirs from asserting a subsequently acquired adverse title to the lands conveyed.

Miss. Code Ann. Sec.89-1-39 (1972). In *Rosenbaum v. McCaskey*, 386 So.2d 387, 389 (Miss. 1980), the Mississippi Supreme Court established that "[a] quitclaim deed operates only as a conduit to pass the grantor's interest to the grantee." It then construed Section 89-1-39 of the Mississippi Code of 1972 to "afford[] the grantee the right to claim for himself any interest in the land covered by the description in the deed . . . ." *Id.* From our recitation of the foregoing statues and cases, I would find that Sections 89-1-37 and 89-1-39 dictate the conclusion that the first correction deed dated September 9, 1970 conveyed to Celeste T. Thomas as a matter of law all of the interest in the subject parcels of land which was not otherwise reserved by any of the grantors in said correction deed. Thus, because Callie D. Turner reserved an undivided one-eleventh (1/11) interest in and to the oil, gas, and other minerals in the parcel of land described in the correction deed, but only that particular

interest, the correction deed conveyed to Celeste T. Thomas all of the remaining undivided ten-elevenths (10/11) interest in and to the oil, gas, and other minerals in the two parcels of land which were described within the first correction deed.

The correction deed from Celeste T. Thomas to Wilson L. Turner contained the following sentence: "This conveyance is made subject to any prior reservation of oil, gas and minerals as may appear of record." Like the first correction deed from Callie D. Turner, her eight children, and the guardian of her four grandchildren to Celeste T. Thomas, the second correction deed from Celeste T. Thomas to her brother, Wilson L. Turner, was also equivalent to a quitclaim deed because it contained no language which indicated that Celeste T. Thomas as grantor warranted title to the land which she was conveying to Wilson L. Turner. Thus, by her execution and delivery of the correction deed to Wilson L. Turner, Celeste T. Thomas conveyed to him all of her interest in the land unless it can be said that she reserved an interest in the oil, gas, and minerals which was in addition to the one-eleventh (1/11) interest already reserved by Callie D. Thomas for herself.

In *Thornhill v. Ford,* 213 Miss. 49, 56 So.2d 23, 26 (1952), the Mississippi Supreme Court attempted to explain the difference between an "exception" and a "reservation" in a deed in the following language:

"A reservation reserves to the grantor some new thing issuing out of the thing granted and not in esse before, and an exception excludes from the operation of the grant some existing portion of the estate or parcel granted which would otherwise pass under the general description of the deed. 26 C.J.S., Deeds, § 137, page 439.

"Under ordinary rules of construction, all that was not unequivocally and specifically reserved was conveyed by the granting clause." *Thornhill v. System Fuels, Inc.*, 523 So.2d 983, 989 (Miss.1988).

I opine that the sentence in the second correction deed from Celeste T. Thomas to Wilson L. Turner, "[t]his conveyance is made subject to any prior reservation of oil, gas and minerals as may appear of record," is an exception which pertains to Callie D. Turner's reservation of her interest in the minerals made in the first correction deed to Celeste T. Thomas, whatever the value of her mineral reservation may have been. It was not Celeste T. Thomas' reservation for herself of an undivided interest in the oil, gas, and minerals which was in addition to her mother's reservation of an interest in the oil, gas, and minerals made in the first correction deed to Thomas. Therefore, I further opine that as a quitclaim deed to her brother, the second correction deed from Celeste T. Thomas conveyed to Wilson L. Turner an undivided ten-elevenths interest in and to the oil, gas, and minerals in the parcels of land described in it pursuant to the same Sections 89-1-37 and 89-1-39.

The effect of these two correction deeds was two-fold. First, the combination of the two correction deeds conveyed to Wilson L. Turner an undivided ten-elevenths interest in and to the oil, gas, and minerals in and to the parcel of land described in them. Second, the first correction deed conveyed to Celeste T. Thomas all of Callie D. Turner's undivided interest in and to the oil, gas, and minerals, of which she originally owned an undivided twelve-twenty-seconds, except the undivided one-eleventh interest which she specifically reserved unto herself. Thus, the first correction deed reduced Callie D. Turner's undivided twelve-twenty-seconds interest in the oil, gas, and minerals to an undivided one-eleventh (1/11) interest in those same minerals, and the second correction deed conveyed to Wilson

L. Turner an undivided ten-elevenths (10/11) interest in the minerals. The application of Sections 89-1-37 and 89-1-39 to the language contained in both correction deeds demands this conclusion and eliminates further concern about the intent of any of the parties to either of the correction deeds.

D. When does the ten-year period of limitation prescribed by Sections 15-1-7 and 15-1-9 begin to run?

In *Newman v. J. J. White Lumber Co*., 162 Miss. 581, 592, 139 So. 838 (1932), the Mississippi Supreme Court held that Sections 15-1-7 and 15-1-9 do not begin to run against a person in the actual or constructive possession of land, and who has the right to such possession. Hence in the case *sub judice*, the statute of limitations, Sections 15-1-7 and 15-1-9, could never begin to run against Wilson L. Turner' ownership of the surface and undivided ten-elevenths (10/11) interest in the minerals under the surface because he was in the actual possession of the surface and, at the very lease, constructive possession of ten-elevenths (10/11) of the minerals beneath the surface, to which possession he had the right by virtue of the second correction deed which his sister, Celeste T. Thomas, had executed and delivered to him.

"The general rule is that statutes of limitation begin to run as soon as there is a cause of action." *Aultman v. Kelly*, 236 Miss. 1, 109 So. 2d 344, 346 (1959) (citations omitted). Therefore, the ten-year period of limitations created by Sections 15-1-7 and 15-1-9 would begin to run against Callie D. Turner no later than February 9, 1971, the date of the second recording of the first correction deed, by the execution and delivery of which, Mrs. Turner lost an undivided five-elevenths (5/11) of her undivided interest in the minerals.

Twenty eight years later, in *Neal v. Teat*, 240 Miss. 35, 126 So. 2d 124, 127 (1961), the Mississippi Supreme Court held that the ten-year period of limitation afforded by Sections 15-1-7 and 15-1-9 had run against grantors who sued to cancel a deed to a mineral interest on grounds of fraud. In *Neal* the supreme court reasoned that the grantee got title under the deed, since it was not void but only voidable, and he also got the constructive possession of the mineral interest. *Id.* Hence the grantors had neither title nor possession and these same sections had run against them and barred their suit. As I previously explained in this dissent, Wilson L. Turner obtained title to five-sixths (5/6) of Callie D. Turner's original undivided 12/22 interest in the minerals, which was the equivalent of an undivided five-elevenths (5/11) interest in the minerals by virtue of the second correction deed from Celeste T. Thomas. I respectfully suggest that *Neal* confirms my opinion that Sections 15-1-7 and 15-1-9 had run against Callie D. Turner and thus barred the Shoemake plaintiffs' suit against Wilson L. Turner as of February 9, 1980, at the latest.

In *Neal*, the Mississippi Supreme Court also explained the consequence of severing all or a portion of the mineral interest from the surface as follows:

After the owner of the general title makes a severance by conveying the fee to all or a part of the minerals, the estate in the surface and the estate in the minerals must be and are regarded as separate and distinct estates, each being a fee simple estate in lands with all the incidents and attributes of such an estate.

*Neal*, 126 So. 2d at 127 (citations omitted). Consequently, the undivided five-elevenths (5/11) interest in the oil, gas, and minerals which Wilson L. Turner obtained from his sister, Celeste T. Thomas, by her execution and delivery of the second correction deed became a separate and distinct fee simple estate in lands with all the incidents and attributes of such an estate.

In *Aultman v. Kelly*, 236 Miss. 1, 109 So. 2d 344 (1959), Raphael C. Cuevas suffered a paralytic stroke which left him "physically unable to comprehend, understand or transact any business whatever." *Id.* at 345. Nevertheless, Cuevas executed and delivered to H. D. Aultman a mineral deed to one-half of the oil, gas, and minerals in 240 acres of land in Hancock County on May 11, 1945. *Id.* Cuevas died on July 22, 1945, and on June 25, 1956, more than ten years after Cuevas had executed and delivered the mineral deed, his heirs filed a complaint against Aultman and others to cancel the mineral deed to Aultman. *Id.* at 346. The Mississippi Supreme Court held that the claim of Cuevas' heirs' to cancel the mineral deed was barred by Sections 709 and 710 of the Mississippi Code of 1942, which are the predecessors of Sections 15-1-7 and 15-1-9 of the Mississippi Code of 1972. *Aultman*, 109 So. 2d at 349.

In arriving at its decision that Sections 709 and 710 barred the claim of Cuevas' heirs, the supreme court emphasized that the mineral deed had been recorded on May 11, 1945. The supreme court observed:

When the cause of action arose, the heirs, whether they had any actual knowledge of the deed or not, had constructive knowledge thereof, because it had been recorded. Constructive notice of the making of a deed begins the moment it is lodged with the proper officer for record. Besides, where the alleged fraudulent conveyance is recorded, the circumstances are public and the means of finding out the character of the transaction are available. Consequently, the running of the statute of limitation is not prevented.

*Id.* at 347. Like the mineral deed in *Aultman*, both correction deeds in the case *sub judice* had been recorded by February 9, 1970. The recording of these two correction deeds gave notice to the Shoemake plaintiffs of the supposed error in the first correction deed, *i. e.*, Callie D. Turner's reservation of only an undivided one-eleventh (1/11) interest rather than her reservation of an undivided twelve-twenty-seconds interest. As the supreme court opined in *Aultman*, "the running of the statute of limitation [was] not prevented." *See Aultman*, 109 So. 2d at 347.

The Mississippi Supreme Court concluded:

In the present case, the deed was executed by Cuevas himself, the owner of the property. It was filed for record on May 11, 1945. The record was notice to the appellees of Tate's claim to the mineral interest. They could not sit idly by and make no challenge of this claim. Under the statutes, they were required to institute a suit within ten years from the accrual of their right. Their failure to do so has effectively barred them of any right which they may have had.

*Aultman*, 109 So. 2d at 349. *See also Ayers v. Davidson*, 285 F. 2d 137, 139 (5th Cir. 1960) (citing *Aultman* to hold that these sections applied when grantors did not commence action within ten years from date deed was recorded to bar grantors' action).

E. Discussion of *Searcy v. Tomlinson Interests, Inc.*, 358 So. 2d 373 (Miss. 1978)

Based upon the cases already reviewed, I can only conclude that the chancellor erred as a matter of law when he held that the Shoemake plaintiffs' claim for reformation of the two correction deeds was not barred by Sections 15-1-7 and 15-1-9 of the Mississippi Code of 1972. However, the majority opinion finds that "[t]he interpretation of the limitation statutes that is urged by Wilson Turner here [with which I agree] was rejected in" *Searcy v . Tomlinson Interests, Inc.*, 358 So. 2d 373 (Miss. 1978), Thus, I review *Searcy* to explain why I think it actually supports my dissent.

The facts in *Searcy* were as follows: W. C. McLeod owned eighty acres of land, less one-half of the minerals which an earlier owner had reserved. *Id.* at 374. In 1952 McLeod conveyed the eighty acres to Vester Thompson, Jr., by warranty deed, which contained the following reservation: "One Fourth interest in all minerals and oil is reserved to the Grantor [McLeod]." *Id.* McLeod, Thompson, and the preparer of the warranty deed all knew that an earlier owner of the land had reserved one-half of the minerals. *Id.* In 1974, Thompson and McLeod's heirs executed an instrument by which they recognized that McLeod's heirs owned one-fourth of the minerals and that Thompson owned the remaining one-fourth of the minerals. *Id.* Thus McLeod's heirs and Thompson recognized the outstanding one-half interest in the minerals which their predecessor in title had reserved. *Id.* In 1971, Thompson executed a mineral lease to one Sims. *Id.* The mineral lease did not specify the size of Thompson's interest in the minerals, but it did contain a "proportionate reduction clause," which provided that rentals and royalties would be proportioned to the interest which Thompson actually owned. *Id.* The McLeod heirs conveyed all of their mineral interests to the Appellants, J. C. Searcy and others; and the Appellee, Tomlinson Interests, Inc. (Tomlinson) had become the owner of the mineral lease which Thompson had executed and delivered to Sims. *Id.*

Searcy and the other complainants had filed a bill of complaint in chancery court to remove clouds on title to a one-fourth mineral interest and to reform the 1952 warranty deed from McLeod to Thompson to make clear that the McLeods' had reserved only a one-fourth mineral interest in the warranty deed to Thompson. *Id.* Tomlinson demurred both generally and specially to the bill of complaint on the ground that Sections 15-1-7 and 15-1-9 of the Mississippi Code of 1972 barred the Searcy complainants' action. *Id.* The chancellor sustained Tomlinson's special demurrer and dismissed the Searcy complainants' bill of complaint. *Id.* The Searcy complainants appealed the chancellor's dismissal of their bill of complaint to the Mississippi Supreme Court, and that court reversed the chancellor's dismissal of the Searcy complaint. *Id.* at 376.

On appeal, Tomlinson's theory of recovery was that "[o]n its face the 1952 deed conveyed and warranted the entire tract except for the reservation of one-fourth of the minerals; accordingly, its apparent effect was to convey three-fourths of the minerals. Since McLeod only owned one-half of the minerals, the apparent result was to convey that one-half, breach the warranty as to one-fourth, and reserve nothing to McLeod." *Id.* at 374. The Mississippi Supreme Court found that Thompson had neither intended nor claimed to possess the one-fourth mineral interest in question. *Id.* The court opined that "[t]he element of intent to possess is an integral part of the concept of constructive possession." *Id.* The Court then concluded:

Accordingly, where, as alleged in the bill of complaint here, a certain mineral interest was included in the deed by mutual mistake, and the grantee does not claim such interest nor intend to own or possess

same, such grantee does not have constructive possession, and the Statute of Limitations in a suit for reformation will not begin to run against grantor until he has notice of some adverse claim thereto or his possession is disturbed in some manner. In the instant case it appears that this did not occur prior to 1971.

*Id.* The supreme court's point in *Searcy* is that Thompson never claimed more than an undivided one-fourth interest in the minerals.

I opine that for *Searcy* to control this issue of whether Sections 15-1-7 and 15-1-9 bar the Shoemake Plaintiffs' claim to reform the two deeds, there must be evidence from which the chancellor might correctly find that Wilson L. Turner, like Vester Thompson, Jr., the grantee in *Searcy*, claimed less than the undivided ten-elevenths undivided interest in the oil, gas, and minerals which Celeste T. Thomas conveyed to him by the second correction deed. I have reviewed the record in this case to find such evidence, only to determine that it is void of evidence on that issue of fact. Indeed, Wilson L. Turner's claim to the entire ten-elevenths undivided interest in the minerals motivated his defense to the Shoemake plaintiffs' claim that the correction deeds ought to be revised.

In *Neal v. Teat*, 240 Miss. 35, 126 So. 2d 124, 127 (1961), the Mississippi Supreme Court opined:

Upon acquiring title to the severed mineral fee estate the owner takes constructive possession of the mineral estate conveyed although the grantor retains title and actual possession of the surface. The theoretical possession known as constructive possession follows in the wake of title.

Wilson L. Turner took constructive possession of an undivided ten-elevenths (10/11) undivided interest in the oil, gas, and minerals when his sister, Celeste T. Thomas, executed and delivered the second correction deed to him. His constructive possession "followed in the wake of [the] title [which the second correction deed conveyed to him]."

Of course, my analysis of *Searcy* and the quotation from *Neal* emphasize what I perceive to be the fundamental difference between the majority's opinion and this dissent. The fundamental difference is that regardless of the operation and effect of the various statutes on the conveyancing of real property, the majority would require that Wilson L. Turner have done something to demonstrate his intent to possess the ten-elevenths (10/11) interest in the minerals which his sister had conveyed to him by the second correction deed. I find that no more necessary than it was for him to demonstrate in some fashion that he intended to possess the surface of the property which his sister had conveyed to him.[1] Just as the second correction deed effectively conveyed the surface to Wilson T. Turner, so did it also effectively convey his sister's undivided ten-elevenths (10/11) interest in the minerals to him. There is no evidence that Wilson L. Turner ever claimed less than his full undivided ten-elevenths (10/11) interest in the oil, gas, and minerals.

On the other hand, Mrs. Callie D. Turner conveyed all of her mineral rights except for an undivided one-eleventh interest in them, which she retained for herself, to her daughter, Celeste T. Thomas. I am convinced that Sections 15-1-7 and 15-1-9 required her to file her complaint to reform the two correction deeds within ten years of the date of the recording of the two instruments, else these two sections forever barred her claim to reform them. Therefore, because the Shoemake Plaintiffs'

complaint to reform the deeds was filed eighteen years after the two correction deeds were recorded, the chancellor erred when he did not dismiss their complaint with prejudice because Sections 15-1-7 and 15-1-9 had barred this claim.

### F. Sections 15-1-7 and 15-1-9 and adverse possession

I agree with the majority that Wilson L. Turner could not exercise adverse possession of the ten-elevenths (10/11) interest in the minerals because for him to have done so, he would first have had to reduce them to his actual possession. (Majority opinion, p.10). However, based upon my previous analysis of *Aultman*, which the United States Court of Appeals for the Fifth Circuit followed in *Ayers*, I disagree that Sections 15-1-7 and 15-1-9 require the application of the concept of adverse possession to activate their running. In that way, these two Sections are different from Section 15-1-13, which does provide:

Ten years' actual adverse possession by any person claiming to be the owner for that time of any land, uninterruptedly continued for ten years by occupancy, descent, conveyance, or otherwise, in whatever way such occupancy may have commenced or continued, shall vest in every actual occupant or possessor of such land a full and complete title . . . .

Miss. Code Ann. § 15-1-13 (Rev. 1995).

### G. Summary of dissent on issue of applying Sections 15-1-7 and 15-1-9 to bar the Shoemake Plaintiffs's claim to reform the correction deeds

I summarize my dissent on this issue by opining that the clock of Sections 15-1-7 and 15-1-9 began ticking no later than February 9, 1971, when Mrs. Callie D. Turner's first correction deed to Celeste T. Thomas was recorded. It chimed for the last time ten years later on February 9, 1981, more than seven years before the Shoemake Plaintiffs filed their complaint to reform the two correction deeds. Throughout the entire seventeen-year period from the recording of the correction deeds until the Shoemake Plaintiffs filed their complaint to reform these deeds, Wilson L. Turner enjoyed the constructive possession of the undivided ten-elevenths (10/11) interest in the minerals which his sister, Celeste T. Thomas, had conveyed to him by the second correction deed.

### II.
### Laches

Because the chancellor did not address the issue of laches in his opinion, I think it is unnecessary to review this issue as the majority has done. *See Terry v. Superintendent of Education*, 211 Miss. 462, 52 So.2d 13, 14 (1951) (holding that because issue of whether sixteenth section lease could not be canceled without notice was not adjudicated in the decree from which the appellant had appealed, the supreme court would not review the issue on appeal because the supreme court "reviews] only such matters as were considered by the lower court"). However, were this issue reviewable by this Court, I submit that laches was a second reason, apart and independent from the statute of limitations issue,

to reverse and render the chancellor's decree. I submit the following two reasons for my opinion

## A. Delay of nineteen years was unreasonable

The majority opines:

There definitely was delay by the various heirs in asserting the claim against Wilson Turner, in that the "claim" has existed since 1970 when the correction deed was executed. Yet the delay is not unreasonable. The family got together in 1970 to correct an instrument that had a bad description. If in fact that was the only purpose for the deed and there was no reason for these lay people to understand that the deed did anything to the mineral interest then it is reasonable that no one would act until the problem was noticed either at the time of oil and gas leasing or at production. Since production did not occur until 1989, it is not unreasonable that no one was aware of this dormant problem until that time.

Majority Opinion, p. 8. Again, with deference to the majority, is it not contradictory to acknowledge that "the 'claim' has existed since 1970 when the correction deed was executed," and then to opine that the delay of nineteen years was not unreasonable because "no one was aware of this dormant problem until that time."? *See Crabb v. Wilkinson*, 202 Miss. 274, 32 So.2d 356, 358 (1947) (stating that "[a]ll persons are presumed to know the legal effect of their acts.") Mrs. Callie D. Turner and all of the Shoemake Plaintiffs executed and delivered both the first deed in 1967 to Celeste T. Thomas and the first correction deed to her in 1971. I indulge in the presumption that all of the grantors in both deeds knew that Mrs. Turner had reserved all of her mineral rights in the first deed but had reserved only an undivided one-eleventh (1/11) interest in the first correction deed. If this were a clerical error worthy of reformation of the first and second correction deeds, waiting nineteen years to seek relief, in my view, was unreasonable because the problem was never "dormant." The presumption that they knew the legal effect of their acts in executing the first correction deed in 1971 eliminates the "dormancy" of this problem.

## B. Intervening death of Mrs. Callie D. Turner

My second reason for my opinion about the efficacy of the defense of laches in this case is the death of Mrs. Callie Turner in 1990. I agree with the majority opinion that she could have stated whether her conveyance of an undivided one-eleventh (1/11) interest in the minerals in the first correction deed to her daughter, Celeste T. Thomas, was a clerical error, the requisite for reformation of the first correction deed. I heartily endorse the majority's statement that "Whether the absence of that view prejudiced or benefitted Wilson Turner cannot be stated, since we do not know what Callie Turner would have said." Majority opinion, p.7. I disagree with the following statement in the opinion that "the alleged prejudice caused by Callie Turner's unavailability to be equally a burden of each side to this dispute, and consequently not a reason in favor of one party by invoking the doctrine of laches." Majority opinion, p.8.

Laches was Wilson L. Turner's defense, not the Shoemake Plaintiffs' defense. Had Mrs. Turner been alive and competent, and had she testified that yes, the reservation of only an undivided one-eleventh (1/11) interest in the minerals was a clerical error which the scrivener who prepared the first correction deed committed, that testimony would h ave favored the Shoemake Plaintiffs. Had she

testified that the reservation of the undivided one-eleventh (1/11) interest in the minerals was not a scrivener's error, then her testimony would have entirely benefitted Wilson L. Turner. Thus, I must respectfully disagree with the majority that "Callie Turner's unavailability [was] equally a burden of each side to this dispute." *See Denison v. McCann*, 197 S.W. 2d 248, 250 (Ky. CA 1946) (holding that doctrine of laches should be applied against claim of daughter to set a side conveyance of her mother after her mother had died because daughter's "delay has closed the mouth of the principal participant in the transaction she is questioning").

Because the chancellor did not address laches in his opinion, even though Wilson L. Turner, included it as an affirmative defense in his answer, I opine that addressing the issue is dispensable. I have addressed the issue of laches only to express my dissent from the majority's conclusion that Shoemake Plaintiffs' delay "was neither unreasonable nor prejudicial to the person raising laches as a defense." Majority opinion, p. 8. I opine that the Shoemake Plaintiffs's delay of nineteen years was both unreasonable and prejudicial.

## III. Summary

While I have discussed and dissented to the majority's findings on the issue of laches, I would reverse and render the decree of the Jones County Chancery Court solely on what I perceive to have been its error in refusing to dismiss the Shoemake Plaintiffs's claim with prejudice because it had become barred by the application of Sections 15-1-7 and 15-1-9 of the Mississippi Code of 1972 (Rev. 1995). Sections 15-1-7 and 15-1-9 are the statutes of limitation which apply to claims to reform deeds; and as the Mississippi Supreme Court held in *Aultman v. Kelly*, the recording of the first correction deed from Mrs. Callie T. Turner and the Shoemake Plaintiffs to Celeste T. Thomas was notice to them of their claim to reform the correction deed, and they were required to institute a suit within ten years form the accrual of that right. Their failure to file their complaint within ten years of the date of the recording of the correction deed effectively barred them of any right which they might otherwise have had.

Sections 15-1-7 and 15-1-9 barred the Shoemake Plaintiffs' claim against Wilson L. Turner for reformation of the correction deed even though Wilson L. Turner could never establish that he had exercised adverse possession of the mineral rights under the facts of this case. This is true because unlike Section 15-1-13, Sections 15-1-7 and 15-1-9 do not require the expiration of ten years of adverse possession to activate them. Sections 15-1-7 and 15-1-9 only require that the plaintiff "commence an action to recover land . . . within ten years next after the time at which the right to make the entry or to bring the action shall have first accrued . . . ." Miss. Code Ann. § 15-1-7 (Rev. 1995).

Neither can I agree with the majority that "[t]here must be an intent to claim dominion before there [can] be an adequate claim right for [Sections 15-1-7 and 15-1-9]." Majority Opinion, p. 8-9. As I have endeavored to demonstrate in this dissent, Wilson L. Turner's intent must be determined by the application of Sections 89-1-37 and 89-1-39 to the language which all of the parties to both correction deeds employed in the deeds. The application of these two statutes to the language which the two deeds contained establishes Turner's intent regardless of what evidence was adduced during the trial.

I demur to the majority opinion's view that *Searcy* is germane precedent because as I have endeavored to demonstrate in my analysis of *Searcy*, McLeod, the owner of minerals whose share was in doubt because by law he might have been entitled to claim one-half of the minerals, only claimed one-fourth of them. Thus, unlike Wilson L. Turner in the case *sub judice*, McLeod claimed *less* than the law might otherwise have allowed him to own. I share the majority opinion's concern that "[a] significant difficulty with the case law is that it could make someone's unknown and unknowable intent controlling." Majority Opinion, p. 11. I suggest that my analysis of the *Searcy* opinion, which distinguishes it from the situation in the case *sub judice* and the determination of the intent of Mrs. Callie D. Turner, Celeste T. Thomas, and the other Shoemake Plaintiffs by applying these two statutes to the language of the two correction deeds eliminate the cause for this concern.

For these reasons, I would reverse and render the decree of the Jones County Chancery court.

**BRIDGES, C.J., AND KING, J., JOIN THIS OPINION.**

1. Before this case was tried, the chancery court entered an agreed judgment which ordered, adjudicated, and decreed that "the surface ownership into the [lands described in the two correction deeds] were quieted and confirmed in Wilson L. Turner."